Case 2:05-cr-00368-TLN-AC   Document 1   Filed 08/24/05   Page 1 of 47

# **FILED**

# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **CALIFORNIA**

**SEALED**

AUG 2 4 2005

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

RICHARD JAMES PULLEY, JR.
aka Khaliq Ali Abdul As Salaam

## **CRIMINAL COMPLAINT**

CASE NUMBER:

**2: 0 5 - MJ 0 0 2 3 8**   DAD

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Between on or about November 9, 2004 and on or about June 17, 2005, in **Sacramento** County, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ knowingly posses numerous firearms after having been convicted of a felony, and possession of a firearm capable of firing in an automatic mode

in violation of Title **18**, United States Code, Section(s) **922(g)(1)**. I further state that I am a(n) FBI Special Agent and that this complaint is based on the following facts:

▸ **SEE ATTACHED AFFIDAVIT**

**X** Continued on the attached sheet and made a part hereof.

Signature of Complainant RACHEL F. PIFER
Special Agent, FBI

Sworn to before me, and subscribed in my presence

*August 23, 2005*

Date

HON. DALE A. DROZD
U.S. Magistrate Judge

Name and Title of Judicial Officer

at   Sacramento, CA

City and State

Signature of Judicial Officer

1  **AFFIDAVIT IN SUPPORT OF APPLICATION FOR COMPLAINT, ARREST WARRANT, AND SEARCH WARRANTS**

2

3       I, Rachel F. Pifer, being duly sworn, depose and say:

4       1.   I am a Special Agent (SA) with the Federal Bureau of

5  Investigation (FBI).  I have been a Special Agent for the FBI

6  since 1999.  In 1999, I completed Special Agent's training at the

7  FBI Academy in Quantico, Virginia, which included instruction in

8  the investigation of violations of federal criminal statutes.

9       2.   By virtue of my employment as a Special Agent, I have

10 performed and continue to perform various duties including:

11           a.   Working as a surveillance agent, detecting and

12 recording the movements of persons;

13           b.   Working as a case agent, directing investigations

14 and supervising other agents and officers;

15           c.   Working investigations that involve substantial

16 electronic surveillance and consensual monitoring, both as a

17 monitoring agent and as a case agent; and

18           d.   Working investigations overseas.

19      3.   This affidavit is submitted in support of the

20 Government's request that a complaint and arrest warrant be

21 issued for the following individual and that search warrants be

22 issued for the following locations:

23 **Individual**

24      Richard James PULLEY Jr., aka Khaliq Ali Abdul As Salaam.

25 **Locations**

26      7871 53rd Avenue, Sacramento, California, 95828 (A-1).

27      3517 33rd Street, Sacramento, California, 95817 (A-2).

28 ///

                                1

1    4.   The facts and information set forth herein are true
2 based upon my personal knowledge and observations, observations
3 of other law enforcement personnel including two employees who
4 acted in an undercover capacity in this investigation, my review
5 of investigative reports and reports and files from Sacramento
6 County Department of Human Assistance (DHA), and records from
7 numerous financial institutions, the Secretary of State and the
8 Department of Motor Vehicles.

9    5.   Since this affidavit is being submitted for the limited
10 purposes of supporting the requested criminal complaint, arrest
11 warrant, and search warrants at specific locations, I have not
12 included each and every fact known to me concerning this
13 investigation.  I have set forth only the facts I believe are
14 essential to establish the necessary foundation to obtain
15 authorization to arrest the individual and conduct the searches
16 described in this affidavit.

17                **I.  SUMMARY OF PROBABLE CAUSE**

18    6.   As set forth in greater detail below, there is probable
19 cause to believe that Richard James PULLEY Jr., aka Khaliq Ali
20 Abdul As Salaam (hereinafter referred to as PULLEY), has violated
21 Title 18 U.S.C. § 922(g)(1) by possessing numerous firearms after
22 being convicted of a felony and that one of these weapons may
23 include a firearm capable of firing in an automatic mode in
24 violation of Title 18 U.S.C. § 922(o).  Further, there is
25 probable cause to believe that evidence and other items relating
26 to PULLEY's possession of such firearms may be found at his
27 residence at 7871 53rd Avenue, Sacramento, California, 95828.
28 ///

1    7.    Additionally, as set forth in greater detail below,
2  there is probable cause to believe that Safiyyah Nichole MATEEN-
3  LEMUS (MATEEN-LEMUS), from 10/13/2004 to Present, and Tayla
4  Delana JACOBS (JACOBS), from 01/12/2001 to Present, have engaged
5  in schemes to defraud the United States Federal Government, the
6  state of California, and Sacramento County, by falsifying
7  documents of eligibility to Sacramento County DHA when applying
8  for cash aid under the CALWORKS program, Food Stamps, and
9  eligibility for Medi-Cal, all in violation of Title 18 U.S.C. §§
10  1341 (Mail Fraud), 1343 (Wire Fraud) and 1347 (Health Care
11  Fraud), and that evidence and other items relating to that fraud
12  may be found at the respective residences of each at 7871 53rd
13  Avenue, Sacramento, California, 95828, and 3517 33rd Street,
14  Sacramento, California, 95817.

15  **II.  BACKGROUND ON INDIVIDUALS INVOLVED IN THE INVESTIGATION**

16    8.    Richard PULLEY, Jr., aka Khaliq Ali Abdul As Salaam,
17  was born on 04/06/1973. PULLEY has a 1991 felony conviction for
18  multiple counts of second degree robbery and was sentenced to 184
19  months in prison. As explained in more detail below, this
20  investigation has determined that PULLEY resides at 7871 53rd
21  Avenue, Sacramento, California, with his wife, Safiyyah MATEEN-
22  LEMUS, and their child Khaliana Islamiyyah Abdul As Salaam, born
23  on 08/21/04. According to information learned by undercover law
24  enforcement personnel and documents obtained from the Sacramento
25  County DHA, PULLEY and MATEEN-LEMUS moved to this residence in or
26  around December, 2004, from their previous residence at 4939
27  Marconi Avenue, #5, Carimichael, California, where they had lived
28  since 2002. According to information learned by undercover law

3

1    enforcement personnel and surveillance, PULLEY recently started
2    working at Sleep Train's Distribution Center.

3        9.   Safiyyah Nichole MATEEN-LEMUS was born on 10/09/86.
4    She is the daughter of Seifudeen Mateen and the wife of Richard
5    PULLEY, Jr.  She has told an undercover law enforcement employee
6    that she has been married to PULLEY since September 2002.
7    MATEEN-LEMUS resides at 7871 53rd Avenue, Sacramento, California,
8    with Richard PULLEY and their daughter Khaliana.  According to
9    information learned by undercover law enforcement personnel, she
10   is not employed.

11       10.  Talya JACOBS was born on 01/24/1974.  She resides with
12   Seifudeen Mateen, her husband of approximately 8 years, and six
13   children at 3517 33rd Street, Sacramento, California.  Based on
14   undercover law enforcement employee reporting, JACOBS and Mateen
15   moved to this residence on or around June 29, 2005 from 7100
16   McClure Court, Sacramento, California.  JACOBS and Mateen moved
17   to the McClure Court residence on or around May 12, 2005, from
18   9090 Fruitridge Road, Sacramento, based on information obtained
19   during this investigation including CCTV coverage and undercover
20   law enforcement personnel reporting.  Based on undercover law
21   enforcement personnel reporting, JACOBS is currently working at
22   Verizon Wireless.  According to EDD records, her past employer
23   was Golden 1 Credit Union.

24       11.  Seifudeen Mateen, aka Steve Hernandez, was born on
25   06/06/57.  He is the father of Safiyyah MATEEN-LEMUS.  Based on
26   information obtained during a law enforcement interview of Mateen
27   and surveillance in this investigation, Mateen was the Amir of a
28   Masjid (Mosque) that was co-located with his and JACOBS' house on

4

1  9090 Fruitridge Road, Sacramento, California, from approximately
2  May, 2002 until May, 2005.  Based on undercover law enforcement
3  personnel reporting, surveillance, documents examined in this
4  investigation, and information provided in a newspaper article,
5  investigators believe that Seifudeen Mateen is the owner or
6  operator of a boxing gym, as well as the owner/operator of a
7  mortuary transport business.

## III.  FIREARMS-RELATED INVESTIGATION

9       12.  I have reviewed copies of PULLEY's certified conviction
10  records from the Superior Court of California, Sacramento County,
11  and certified computerized criminal history, which are maintained
12  by the California Department of Justice.  My review of those
13  records revealed that on October 5, 1990, PULLEY was convicted in
14  Sacramento County, California Superior Court, on multiple felony
15  counts of committing second degree robbery, in violation of
16  California Penal Code 211, Robbery, docket number CR98268.

17       13.  On November 9, 2004, PULLEY had a conversation with
18  undercover law enforcement employee #1 (the two undercover
19  employees are hereinafter referred to as UCE #1 and UCE #2), in
20  which he stated he owns a ".9mm", a ".38", a ".380", and an
21  "SKS."  Later that same day, PULLEY and UCE #1 went to several
22  gun stores in the Sacramento area.  PULLEY told UCE #1 and the
23  gun store clerks that PULLEY was looking for a magazine for his
24  Jennings .9mm and a magazine release lever for his Lorcin .380.

25       14.  Based on my conversations with Special Agent Trista K.
26  Frederick of the Bureau of Alcohol, Tobacco, Firearms and
27  Explosives (ATF), I know that it is common for individuals to
28  refer to handguns as their specific caliber.  For example, a .38

5

1  would be in reference to a .38 caliber handgun.  In addition, the
2  term "SKS" when used in the context of firearms usually refers to
3  an assault-type rifle which may be capable of firing in an
4  automatic mode.

5      15.  On December 13, 2004, PULLEY explained to UCE #1 how to
6  convert a semi-automatic SKS to function in a fully-automatic
7  mode, which entailed manipulating the firing pin in some manner.
8  On the same date, according to UCE #1, while at PULLEY's
9  residence at 7871 23rd Avenue, Sacramento, California, PULLEY
10  showed UCE #1 the SKS and UCE #1 observed what appeared to be a
11  .380 Lorcin handgun and a .9mm handgun.

12      16.  On January 11, 2005, according to UCE #1, UCE #1 showed
13  PULLEY a Glock 27 that UCE #1 supposedly had just purchased, to
14  which PULLEY stated that he could have obtained UCE #1 a better
15  price on the weapon.  On that same date, while at PULLEY's
16  residence at 7871 53rd Avenue, Sacramento, California, PULLEY
17  showed UCE #1 what PULLEY identified as a .32 revolver.  PULLEY
18  also showed UCE #1 what PULLEY identified as a .380 and a .9mm
19  (both of which weapons UCE #1 had observed at PULLEY's residence
20  on December 13, 2004).  PULLEY stated that he usually leaves the
21  .32 revolver with his wife, known by agents in this investigation
22  as more fully explained below to be MATEEN-LEMUS.  PULLEY further
23  stated that his SKS was with a relative.  In addition, PULLEY
24  stated he had shot the weapons the other day at the Masjid, which
25  is believed by agents based on the results of this investigation
26  to date to have been located, at that time, at 9090 Fruitridge
27  Road, Sacramento, California.

28  ///

6

1        17.   I have reviewed a video recording of CCTV surveillance
2   on the night of December 31, 2004, at the now defunct Masjid Al
3   Mu'mineen, which revealed what appeared to be two individuals
4   driving onto the property in a single car.  The individuals then
5   took firearms out of the trunk of the car, and fired shots into
6   the air.

7        18.   On February 25, 2005, according to UCE #2, MATEEN-
8   LEMUS, PULLEY's wife, told UCE #2 that she keeps PULLEY's guns in
9   a baby bag so that PULLEY is not at risk of going to prison since
10  he has a criminal record and is not allowed to have guns.

11       19.   On March 22, 2005, PULLEY explained to UCE #1 that he
12  was upset because an unidentified male had sold an SKS for
13  $200.00 recently, and failed to offer it to PULLEY first.

14       20.   On April 22, 2005, according to UCE #1, UCE #1 observed
15  a loaded revolver on the night stand in the master bedroom of
16  7871 53rd Avenue, Sacramento, California.  UCE #1 stated that
17  this appeared to be the same revolver UCE #1 had observed on
18  January 11, 2005.

19       21.   On May 19, 2005, MATEEN-LEMUS told UCE #2 that she had
20  a .22 revolver and a .380 handgun.  According to UCE #2, later
21  that day, at PULLEY and MATEEN-LEMUS's residence at 7871 53rd
22  Avenue, Sacramento, California, MATEEN-LEMUS pulled a small black
23  leather handbag with a strap from underneath the bed in the
24  master bedroom.  MATEEN-LEMUS opened the bag and showed UCE #2
25  the black metal handgun that was inside the bag, and then took
26  the gun out and handed it to UCE #2.  UCE #2 observed the gun to
27  be a Lorcin, serial number (hereinafter referred to as S/N)
28  139758, manufactured in Mira Loma, California.  MATEEN-LEMUS then

7

1 retrieved a revolver from the night stand next to the bed in the
2 master bedroom.  UCE #2 observed the gun to be a Sentinel Deluxe,
3 nine (9) shot revolver, S/N 2131932, manufactured in
4 Connecticut.

5     22.  On June 17, 2005, according to UCE #1, UCE #1 showed
6 PULLEY an AR-15 semi-automatic assault rifle, to which PULLEY
7 stated that it was larger than PULLEY's SKS.  PULLEY further
8 stated that his cousin still had his SKS and also his .22 rifle,
9 which has been installed with a scope.  PULLEY stated that he had
10 been to a berm in the Sacramento area and shot all of his weapons
11 at the berm, including the SKS.  PULLEY also talked that day
12 about needing to go to some gun stores to buy accessories for all
13 of his weapons.

14     23.  On or around May 20, 2005, SA Frederick, who has
15 received specialized ATF training in the recognition and
16 identification of firearms and their place of manufacture, was
17 requested to determine the origin and status as to travel in
18 interstate and/or foreign commerce of two of the firearms
19 observed by the UCEs in PULLEY's residence, specifically, one
20 Lorcin, Model L380, .380 caliber pistol, S/N 139758 and one High
21 Standard, Model Sentinel Deluxe, .22 caliber revolver, S/N
22 2131932.

23     24.  SA Frederick determined that the High Standard revolver
24 was manufactured by High Standard Manufacturing Company in
25 Connecticut.  Therefore, in order for this firearm to be
26 possessed in the State of California, it traveled in or affected
27 interstate commerce.

28 ///·

8

1     25.   On or around May 20, 2005, SA Frederick requested a
2  firearms trace of the Lorcin, Model L380, .380 caliber pistol,
3  S/N 139758 from the ATF National Tracing Center.  The trace
4  results, T20050106575, revealed that the firearm was manufactured
5  by Lorcin Engineering in Mira Loma, California.  On March 12,
6  1993, Lorcin shipped the firearm to AJ Wholesale Gun
7  Distributors, Inc., located in Phoenix, Arizona.  On June 15,
8  2005, the ATF National Tracing Center provided SA Frederick with
9  a copy of Lorcin Engineering's Acquisition and Disposition Record
10  regarding the above transaction.  Therefore, this firearm
11  traveled in or affected interstate commerce.

12     26.   FBI Agents have surveilled the residence at 7871 53rd
13  Avenue, Sacramento, California, on more than thirty occasions
14  since approximately December, 2004.  On many of those occasions
15  Agents observed the individual known to be PULLEY, based on UCE
16  information and other investigative efforts, to enter and exit
17  the residence located at 7871 53rd Avenue, Sacramento,
18  California.  In addition, on May 31, 2005, cellular phone
19  subscriber records from T-Mobile were reviewed and showed
20  PULLEY's residence as 7871 53rd Avenue.  Further, PULLEY's
21  drivers license record shows his current address as 7871 53rd
22  Avenue.

23     27.   I have learned through conferring with SA Frederick
24  that persons who unlawfully purchase and/or possess firearms,
25  ammunition and other items associated with firearms described in
26  this affidavit do not readily dispose of the same.  These items
27  can be found in the areas described in this affidavit many months
28  and often years after their initial acquisition.

9

1    28.  I have learned through conferring with SA Frederick
2  that based on SA Frederick's training and experience, individuals
3  with a sustained history of gun ownership including self-
4  acknowledged possession of illegal firearms often fail to comply
5  with court orders to dispose of their firearms.

6    29.  Based upon my training, experience, and conversations
7  with SA Frederick, I believe there exists probable cause to
8  believe that PULLEY remains in possession of firearms in
9  violation of Title 18 U.S.C. Sections 922(g)(1) and 922(o).  Also
10  based upon the above and upon PULLEY's past practices, I believe
11  that PULLEY likely continues to possess the above-mentioned
12  firearms inside the residence at 7871 53rd Avenue, Sacramento,
13  California, and/or in his vehicles and/or the storage buildings
14  on the same property.

15          **IV.  FRAUD-RELATED INVESTIGATION**

16  **A.  CALWORKS/Food Stamp/Medi-Cal Programs**

17    30.  I have learned through my discussions with Sacramento
18  County Department DHA personnel that California Work Opportunity
19  and Responsibility to Kids (CALWORKS) is a welfare program that
20  gives cash aid and services to eligible needy California
21  families.  The program serves all 58 counties in California and
22  is administered in the Sacramento area by the Sacramento County
23  DHA.  Families that apply and qualify for ongoing assistance
24  receive money each month to help pay for housing, food and other
25  necessary expenses.  I have learned from Sacramento County DHA
26  officials that over half of the funding for the CALWORKS program
27  is from the federal government, the rest is from the state, with
28  a small percentage from the county.

10

1   31.   CALWORKS payments are currently issued in the form of
2 an Electronic Benefits Transfer (EBT).   The recipients are
3 provided an electronic debit card, referred to as an EBT card.
4 Benefits are credited monthly to the card.   This replaces the
5 mailing of checks from Sacramento County.   The card then is like
6 an ATM card and the user can withdraw money from an ATM machine.

7   32.   The Food Stamp Program is a federally funded program
8 that helps low-income people buy the food they need for good
9 health.   It is governed by the United States Department of
10 Agriculture and administered locally through Sacramento County
11 DHA in conjunction with the CALWORKS program.   The Department of
12 Agriculture also pays the county for the administration of the
13 Food Stamp program.   Like CALWORKS, benefits for the Food Stamps
14 program are credited to an EBT card.   The EBT card can then be
15 used like an ATM card at the grocery store.   If eligibility is
16 met for CALWORKS and Food Stamps, MEDI-CAL is automatically
17 received.

18   **B.   Safiyyah MATEEN-LEMUS**

19   33.   I have reviewed Sacramento County DHA records on
20 MATEEN-LEMUS, including applications for assistance and
21 supporting paperwork completed by MATEEN-LEMUS.   According to
22 Sacramento County DHA records, MATEEN-LEMUS has received a total
23 of $8,437.00 in benefits under the CALWORKS and Food Stamps
24 programs from September, 2004 to the present, consisting of
25 $6,092.00 in Cash Aid and $2,345.00 in Food Stamps benefits.

26   34.   As part of my review of these records, I reviewed a
27 written application for MATEEN-LEMUS to receive program benefits,
28 dated 10/12/04.   I also reviewed a form entitled "Statement of

11

1  Facts for Cash Aid, Food Stamps, and Medi-Cal/State-Run County
2  Medical Services Program(CMSP)," bearing a signature of
3  MATEEN-LEMUS under penalty of perjury and dated 10/13/04.  The
4  form is designed to provide factual support for an application
5  filed for program benefits.  The form requests information on
6  assets and income of adult relatives living in the home.  On the
7  form dated 10/13/04, MATEEN-LEMUS' answers to a number of
8  questions are contrary to information that has been developed
9  during this investigation.

10      35.  On the form, MATEEN-LEMUS lists 4939 Marconi Avenue,
11 #5, Carmichael, California, as her then residential address.  She
12 states on the form that she has never been married, and she does
13 not list any adults other than herself as living in the home.  On
14 the form, MATEEN-LEMUS lists her child Khaliana Abdul As Salaam
15 as living with her and requests program benefits for Khaliana.
16 MATEEN-LEMUS states on the form that Khaliana's father's name is
17 Khaliq Abdul As Salaam, and lists Khaliq Abdul As Salaam as a
18 parent not living in the home, with a handwritten explanation,
19 "not living together," and "one night stand."

20      36.  As detailed below, this investigation has determined
21 that MATEEN-LEMUS has been married to PULLEY, aka Khaliq Ali
22 Abdul As Salaam, for almost 3 years.  Investigation has further
23 identified PULLEY and Khaliq Ali Abdul As Salaam to be the same
24 individual.

25      37.  According to UCE #1, UCE #1 has known PULLEY for
26 approximately one and one-half years.  UCE #1 and PULLEY attend
27 religious services together and engage in social activities such
28 as shopping and dinning out.  UCE #1 refers to PULLEY as Khaliq.

12

1 UCE #1 has been shown a picture of PULLEY and identified him as
2 Khaliq. On March 24, 2005, UCE #1 sold a vehicle to PULLEY and
3 PULLEY, known to UCE #1 as Khaliq, used the name Richard Pulley
4 on the vehicle registration and insurance.

5    38.  According to UCE #1, UCE #1 has always known PULLEY to
6 be married and has been to PULLEY's residence on numerous
7 occasions, during which MATEEN-LEMUS has been there most times.
8 According to UCE #1, PULLEY refers to MATEEN-LEMUS as his wife
9 and Khaliana as his child.

10    39.  According to UCE #2, UCE #2 has known PULLEY, aka
11 Khaliq, and MATEEN-LEMUS for over six months. During that time,
12 UCE #2 has known MATEEN-LEMUS to be married via the Muslim faith
13 to PULLEY. During a recorded conversation on May 19, 2005,
14 MATEEN-LEMUS told UCE #2 that her husband goes by the name Khaliq
15 because his father is from the Sudan and is named Khali Ali-
16 Salaam.  MATEEN-LEMUS told UCE #2 that PULLEY's father changed
17 his name for business reasons from Salaam to Richard Pulley
18 Senior when he moved to the United States.  MATEEN-LEMUS further
19 explained to UCE #2 that Khaliq's mother named him Richard Pulley
20 Junior, and that Khaliq does not have any documents in the name
21 Khaliq but has everything in the name Richard Pulley Junior.

22    40.  In a further recorded conversation, MATEEN-LEMUS told
23 UCE #2 that PULLEY started going by the name Khaliq when PULLEY
24 was in prison.  MATEEN-LEMUS also told UCE #2 that PULLEY is
25 saving money to change his legal name as soon as he can afford
26 it.  For this reason, according to MATEEN-LEMUS, PULLEY's name on
27 his driver's license and car insurance policy is listed as
28 Richard Pulley.

13

1    41.   As part of this investigation, I reviewed a photo copy
2  of a Sacramento County Department of Health and Human Services
3  birth certificate for Khaliana Islamiyyah Abdul As Salaam, dob
4  08/21/04.   The birth certificate lists the father as Khaliq Ali
5  Abdul As Salaam, dob 04/06/73, and the mother as Safiyyah Mateen,
6  dob 10/09/86.

7    42.   On the "Statement of Facts" form dated 10/13/04,
8  MATEEN-LEMUS states that no one in the household has cash or bank
9  accounts.   This investigation has determined that PULLEY has
10 signature authority for Washington Mutual Bank accounts numbered
11 0098-0000214916-6 and 0098-0000214916-7, titled BOGARD HUSTLA
12 INC.   The accounts were opened on 07/19/04 and 10/14/04.

13   43.   On the "Statement of Facts" form dated 10/13/04,
14 MATEEN-LEMUS answers "none" when asked if any adult in the
15 household owns or has the use of a motor vehicle.   This
16 investigation has determined through records checks with the
17 Department of Motor Vehicles that PULLEY is the registered owner
18 of two vehicles: a Nissan Sentra with license plate number
19 5GOU627, vin number 1N4EB32A9PC773071, from 07/29/03 - 06/28/05,
20 and a Ford Aerostar with licence plate number 5LQZ809, vin number
21 1FMDA31U7VZB99046, from 03/25/05 - Present.   Surveillance
22 officers during this investigation have observed PULLEY operating
23 both vehicles and MATEEN-LEMUS driving the Ford Aerostar.

24   44.   Also on the form, MATEEN-LEMUS states that no adult in
25 the household is working or expecting to be working in the next
26 two months.   UCE #1 states that PULLEY started working at Sleep
27 Train in March, 2005, generally working Sunday through Thursday
28 from 1 p.m. until 9 p.m.   UCE #2 states that MATEEN-LEMUS drives

14

1 | with PULLEY to work on the days that PULLEY receives his
2 | paycheck, then PULLEY and MATEEN-LEMUS cash the check at the
3 | bank.  On at least three occasions since March, 2005,
4 | surveillance officers in this investigation have observed
5 | PULLEY's vehicle parked in front of the Sleep Train Distribution
6 | Center located at 4380 Warehouse Court, North Highlands,
7 | California.

8 | 45.  In addition, to his work at SLEEP TRAIN, this
9 | investigation has developed information that PULLEY has a
10 | business identified as Bogard Hustla Inc., 3323 Watt Avenue #219,
11 | Sacramento, California, 95821.  Secretary of State records reveal
12 | that articles of incorporation were filed by Richard Pulley Jr.
13 | on 07/07/04 for Bogard Hustla Inc.  The type of business is
14 | listed in these records as entertainment.  According to UCE #1,
15 | PULLEY rents space at a recording studio and is a rapper.  In
16 | 2004, PULLEY sold CD's entitled "Brotha Khaliq Movement" to UCE
17 | #1 and other individuals.  According to UCE #1, PULLEY said that
18 | he had a website through which he sold CDs, but that it was shut
19 | down.  Also according to UCE #1, PULLEY told UCE #1 that he
20 | (PULLEY) receives royalty checks.

21 | 46.  As part of my review of documents relating to MATEEN-
22 | LEMUS' Sacramento County DHA file, I reviewed a State of
23 | California/Health and Human Services form (CW 71) entitled
24 | "Statement of Cash Aid Mother and Unrelated Adult Male" which
25 | bears the signatures of PULLEY and MATEEN-LEMUS under penalty of
26 | perjury and is dated 11/15/04.  PULLEY is named as the "Unrelated
27 | Adult Male (UAM)" who lives with MATEEN-LEMUS.  PULLEY's gross
28 | monthly income is listed as $1,136.00.  In Section #7, when asked

15

1  if she considers herself and the UAM a family, MATEEN-LEMUS
2  states, "no".

3      47.  I also reviewed a Form SC 202, which is an affidavit,
4  bearing the signature of MATEEN-LEMUS and is dated 10/25/04, in
5  which she declares under penalty of perjury that the foregoing is
6  true and correct:  Daughter and myself have been living here
7  since Sep. of 02 on and off, still living w/dad, while also
8  staying here.  We have a room mate Richard Pulley, who is not my
9  childs father.  Male on voicemale [sic] is roommate Richard
10  Pulley.  We purchase and prepare seperatley [sic].

11      48.  I have learned from Sacramento County DHA personnel
12  that once an individual or family has been approved under the
13  CALWORKS program or Food Stamp program, they are required to
14  complete eligibility reports on a regular basis which are mailed
15  to them by Sacramento County DHA and which they mail back to or
16  drop off at Sacramento County DHA's offices.  As part of this
17  investigation, I reviewed Quarterly Eligibility/Status Reports
18  that were mailed to MATEEN-LEMUS, then completed by her and
19  returned to the county, dated September, 2004, October, 2004,
20  January, 2005, May, 2005, and August, 2005.

21      49.  On each of the five quarterly reports, MATEEN-LEMUS
22  responds "no" to all eight questions asking whether there have
23  been any changes in her status or income.  Each quarterly report
24  bears the signature of MATEEN-LEMUS certifying that she
25  understands that if she does not report all facts or gives wrong
26  facts regarding income, property, or family status to keep
27  getting aid, she can be prosecuted and that she may be charged
28  ///

16

1 with a felony if more than $400.00 in Cash Aid, Food Stamps,
2 and/or State CMSP is wrongly paid out.

3 **C. Talya JACOBS**

4 **1. Medi-Cal Eligibility**

5   50.  As part of this investigation, I reviewed Sacramento
6 County DHA records on Talya JACOBS, including applications for
7 Medi-Cal eligibility and supporting paperwork completed by
8 JACOBS.  I reviewed Medi-Cal Eligibility Review forms bearing
9 JACOBS's signature under penalty of perjury and dated 11/09/04,
10 12/03/03, 10/11/02 and 11/05/01.  On each of the forms JACOBS
11 lists her husband as Seifudeen Mateen.

12   51.  The employment section of each Eligibility Review form
13 requests that the applicant list all persons in the household who
14 are working and to provide a pay stub for each, or a tax return
15 for a person who is self-employed.  On each of the four forms,
16 JACOBS leaves the section blank.  In the business section of each
17 form, JACOBS answers "no" to questions asking whether any person
18 in the household has a business or self-employment checking
19 account or cash and whether anyone has business equipment,
20 vehicles, tools, inventory or materials.

21   52.  This investigation has developed information that,
22 contrary to JACOBS' statements on the forms, JACOBS and her
23 husband Mateen participated in a number of businesses since 2001.

24   53.  First, I have reviewed documents showing that the
25 county of Sacramento issued a business license to JACOBS as the
26 owner of Al-Mu'mineen Transport on 08/26/02.  According to
27 documents obtained in this investigation, Al Mu'Mineen Transport
28 is located at 9090 Fruitridge Road, Sacramento, California.

17

1   According to the application, JACOBS applied for the license on
2   07/14/02.  She indicates on the application that she has sole
3   ownership.  I have reviewed bank records showing ten checks made
4   out to Al-Mu'mineen Transport Service that were deposited into
5   the Masjid Al-Mu'mineen account from March, 2004 through August,
6   2004 for a total of $5,000.25.  The checks were endorsed by
7   Mateen.  A business card for Al-Mu'mineen Transport Service lists
8   Mateen as a contact for the business.  On 01/30/04, JACOBS
9   returned a form sent to her by the Sacramento County Department
10  of Finance, License Section, entitled "Information Update Form,"
11  certifying the information to be correct regarding her business
12  and that she was the owner.

13      54.  Second, surveillance, interviews, bank records, state
14  documents and discussions with UCE #1 indicate that Mateen was
15  the Amir/Administrator of the Masjid Al-Islam/Al-Mu'Mineen from
16  May, 2002 to May, 2005.

17      55.  Third, this investigation has developed information
18  that since April 2004, Mateen has been the owner and operator of
19  a boxing gym called "Mateen Club," located at 8301 Demetre
20  Avenue, Sacramento, California.  According to UCE #1, UCE #1 has
21  observed Mateen at the boxing club since April 30, 2004, and
22  people refer to the club as Mateen's.  I have reviewed bank
23  records showing that a check for $1,500.00 was deposited into
24  Masjid Al-Mu'Mineen's account on 04/12/04, from Mateen Boxing
25  Club; on the "for" line "equipment" is written.  The check
26  appears to be signed by Angie Zuniga, who is believed by agents
27  in this investigation based on undercover employee reporting and
28  the results of the investigation to date to be Mateen's business

18

1  partner.   Database checks for Fictitious Business Names or
2  Articles of Incorporation were negative.   Additionally, I have
3  reviewed an April 14, 2005 Sacramento Bee article on Mateen and
4  Mateen's ownership of a boxing club named "Mateen Boxing Club."

5       56.   Fourth, bank records I have reviewed indicate that
6  Seifudeen Mateen was paid a total of $4,600.00 from 08/30/02 to
7  10/07/02 from what is believed based on the results of this
8  investigation to date to have been his employer, JNC Mortuary &
9  Diversified Services.   The April 14, 2005 Sacramento Bee article
10 mentioned above states that Mateen also has a mortuary transport
11 business.

12      57.   Also on the Medi-Cal Eligibility Review forms I
13 reviewed, the applicant is asked to list all resources available
14 to the applicant, the other parent/spouse, or children living in
15 the house, including cash, uncashed checks, savings or checking
16 accounts, and annuities.   JACOBS does not list any such resources
17 on the four forms I reviewed.

18      58.   This investigation has identified the following bank
19 accounts associated with the following individuals/entities:

20           a.   Seifudeen Mateen, Wells Fargo, 07/03/01 - 02/07/02;
21           b.   Seifudeen Mateen, Safe Credit Union, Account
22 Number: 306178, opened 12/06/01, closed 11/26/02;

23           c.   Tayla JACOBS, Wells Fargo, Account Number:
24 265-4089750 (Savings), opened 03/23/05, Account established, but
25 no transactions, still active; Account Number: 280-6025397
26 (Checking), opened 03/23/05, still active;

27           d.   Tayla JACOBS/Deloris Jacobs, Wells Fargo, Account
28 Number: 643-4130639 (Savings), opened January, 2002, closed

19

1   4/17/03, Account established but no transactions; Account Number:
2   043-4318671 (Checking), opened 12/18/99, closed 11/23/01;

3             e.   Tayla JACOBS, Safe Credit Union, Account Number:
4   309482, opened 02/14/02, closed 02/03/03;

5             f.   Tayla JACOBS, Bank of America, Account Number:
6   04320-01903, opened 1998, closed August, 2002;

7             g.   Masjid Al-Mu'mineen, Wells Fargo, Account Number:
8   750-0116103, opened January, 2003, still open, signature
9   authority:  Seifudeen Mateen;

10            h.   Masjid Al-Islam, Wells Fargo, Account Number:
11  750-0116756, opened August, 2002, closed July, 2003, signature
12  authority:  Seifudeen Mateen, Talya Jacobs; and

13            i.   Masjid Al-Islam, Wells Fargo, Account Number:
14  063-5504673, opened January, 2001, closed July, 2002, signature
15  authority:  Seifudeen Mateen.

16       59.  Also on the Medi-Cal Eligibility Review forms I
17  reviewed, the applicant is asked to list all real and personal
18  property including houses, land, and apartments that the
19  applicant owns or has or shares title to, including property the
20  applicant has sold.  On each form, JACOBS did not list any such
21  property.

22       60.  According to county database ownership records, Talya
23  Delana JACOBS was the owner of 4231 13th Avenue, Sacramento,
24  California, from 09/14/99 to 12/10/03 and sold the home to Louay
25  Elhadj for $12,000.00.

26       61.  Also on the Medi-Cal Eligibility Review forms I
27  reviewed, the applicant is asked to list all cars, trucks, and
28  other vehicles owned by the applicant or applicant's family, even

20

1 if not in running condition. JACOBS left this section blank for
2 the 2001, 2003, and 2004 forms and wrote "none" on the 2002 form.
3    62. A records check of California Department of Motor
4 Vehicles revealed the following vehicles registered to JACOBS,
5 her husband or his business:
6         a. Talya D Jacobs, 128LTA, 1352038908, 07/07/00 -
7 04/14/03;
8         b. Talya D Jacobs, 5GOU627, 1N4EB32A9PC773071,
9 06/28/05 - present;
10        c. Angelica Zuniga/Seifudeen Mateen, 7D69813/3H56913,
11 JB7FL24D4HP074731, 02/11/03 - present;
12        d. Seifudeen Mateen, 4GGJ160, 1G6CD6984G4361928,
13 09/06/01 - 10/10/02;
14        e. Seifudeen Mateen, 4BKT932, 1B3ES47C0TD723725,
15 11/15/04 - present;
16        f. Steve Hernandez/Talya Jacobs, 3POM325,
17 3FALP6534SM143070, 03/06/00-03/15/03;
18        g. Seifudeen Mateen, 3BNU478, 1FDEE14HXNHA31760,
19 03/13/02 - present;
20        h. Al Mumineen Trans Svc, 6D77195, 2B7HB21Y5VK506846,
21 04/22/04 - present; and
22        i. William Hernandez/Seifudeen Mateen DBA Almumineen
23 Transport, 5FHJ353, CA868410, 3/16/04 - present.
24    63. As part of my review of records relating to JACOBS'
25 application for Medi-Cal eligibility, I reviewed copies of
26 letters mailed to JACOBS at 9090 Fruitridge Road, Sacramento,
27 California, dated 10/27/03 and 10/25/04 requesting information
28 ///

21

1  from JACOBS concerning her annual reinvestigation for Medi-Cal
2  eligibility.

3      **2. Food Stamps**

4      64.  As part of my review of Sacramento County DHA records
5  on Talya JACOBS, I have reviewed applications for Food Stamps by
6  JACOBS and supporting paperwork.  According to the records I
7  reviewed, JACOBS filed applications to receive food stamps in
8  2001, 2002 and 2003.  In 2001, her application was granted, but
9  in 2002, a complaint was filed and JACOBS asked that her case be
10 discontinued.  Later in 2002, JACOBS applied again, and the
11 application was granted contingent on a home visit.  After the
12 home visit, her case was discontinued.  In 2003, her application
13 was denied.  The applications bear JACOBS' signature and are
14 signed under penalty of perjury.  According to DHA's records,
15 JACOBS received a total of $3,490.00 in food stamps from 01/31/01
16 to 07/01/02.

17     65.  Two of the documents I reviewed in JACOBS' DHA file are
18 entitled, "Statement of Facts for Cash Aid, Food Stamps, and/or
19 Medi-Cal/State CMSP," and bear JACOBS' signature under penalty of
20 perjury and are dated 11/01/2001 and 07/02/2002.  On each form,
21 in response to a question whether anyone in the household owns or
22 is buying real estate, JACOBS checked "no."  In addition to the
23 real property mentioned above owned by JACOBS during that period,
24 this investigation has developed information that JACOBS' husband
25 Mateen entered a lease to purchase transaction for real property
26 in May of 2002.  Mateen advised agents in an interview in 2002
27 that he owned the property located at 9090 Fruitridge Road,
28 Sacramento, California, and that he makes payments on the

22

1 property every six months.  A fund-raising flyer for Mateen's
2 mosque stated that the land was acquired in May, 2002, that the
3 cost of the land was $375,000.00, interest free, and an
4 installment payment of $33,000.00 was made toward the masjid, so
5 that the balance was $345,000.00.  According to information
6 developed in this investigation, Mateen fell behind in his
7 payments and lost the option to buy the property.  I have
8 reviewed bank records showing that on 04/22/02, a $15,000.00
9 payment was made by check from an account in the name of
10 Al-Islam, the former name of Masjid Al-Mu'mineen, to Louay El
11 Hadj.  On the "for" line "lease with option to buy 9090
12 Fruitridge" appears.  According to the bank records I reviewed,
13 Seifudeen Mateen paid over $70,000 to El Hadj over time.

14    66.  Also on the "Statement of Facts" forms I reviewed,
15 JACOBS indicates "no" to questions asking whether anyone in the
16 household has personal or business-related resources including
17 cash, uncashed checks, savings accounts, checking accounts, and
18 credit union accounts.  As noted above, this investigation has
19 developed information that JACOBS and Mateen had a number of
20 accounts at financial institutions during this time period.

21    67.  Also on the "Statement of Facts" forms I reviewed,
22 JACOBS indicates "no" to questions asking whether anyone in the
23 household owns, has the use of or has their name on the
24 registration of any motor vehicles, such as an automobile.  As
25 noted above, this investigation has developed information that
26 JACOBS and Mateen had a number of vehicles registered to them
27 during this time period.

28 ///

23

1    68.   As part of my review of documents in JACOBS' DHA case,
2  I reviewed monthly eligibility reports mailed to JACOBS and
3  returned to DHA for the periods of August, 2000, September, 2000,
4  December, 2001, and July, 2002.  Each eligibility form asks
5  whether anyone in the household received income from a job or
6  training program or any other source, and JACOBS' response was
7  "no."  Each form also asks whether anyone received money or
8  benefits from any other source, including legal settlements,
9  cash, gifts, government benefits, rental income, and rental
10 assistance.  JACOBS' response was "yes," but claimed only the
11 receipt of disability or unemployment.  Each form also asks
12 whether anyone has anything else to report, including expected
13 changes.  JACOBS responds "yes" on a form to having given birth,
14 but does not report any bank accounts or sales of property or
15 vehicles.

16 **D.   Searches Of Residences And Vehicles**

17      1.   **Evidence Of Fraud In Residence And Vehicles**

18    69.   Based on my training and experience and on
19 conversations with other experienced law enforcement agents, I
20 know that individuals involved in fraudulent activity commonly
21 keep evidence of their criminal activity in their homes and
22 vehicles.  In cases of welfare program fraud, such evidence can
23 include documents such as address books, "Rolodex" files, email
24 directories, emails, correspondence, envelopes and mailing
25 labels, and telephone bills showing telephone calls, which
26 pertain to or reflect communications between the individuals and
27 the agencies they defraud.  Such evidence can also include in
28 such cases documents that reflect income, employment, assets,

24

1  cash and cash deposits, bank and credit union accounts, real
2  property, business and partnership ownership interests belonging
3  to or being controlled by the individuals that pertain to or
4  contradict statements made by the individuals to such agencies
5  concerning assets and income.  Such documents can include banking
6  and financial institution records, wire transfer records, bank
7  statements, canceled checks, deposit slips, check registers,
8  check stubs, applications for and receipts for cashier's checks,
9  money orders, traveler's checks, bank wires, bank drafts, bonds,
10  stock certificates, certificates of deposit, bank transfers, safe
11  deposit keys, safe deposit box receipts, and documentation of
12  financial transactions reflecting the movement of currency and/or
13  negotiable instruments, retained copies of federal and/or state
14  tax returns and related tax preparation files to include work
15  papers, schedules, receipts, and any other source documents
16  showing the acquisition of assets, expenditures, and sources of
17  income as well as records, documents, and deeds reflecting the
18  purchase, lease or ownership of real estate, motor vehicles,
19  furniture, appliances, securities, precious metals, jewelry, and
20  other assets of significant, like value.  Such documents can also
21  include appointment books, calendars, time planner books, desk
22  plotters, correspondence, and "scratch pads" containing notes of
23  appointments, orders, and purchases relating to the fraud or to
24  assets and income of the individuals involved in the fraudulent
25  activity.

26      70.  Where individuals involved in welfare program fraud use
27  the mails and/or private courier services as part of the criminal
28  activity, or cause the involved agencies to do so, they often

25

1 have in their homes and vehicles documents reflecting
2 communications with such agencies through the use of the mails
3 and/or private courier services.  This investigation has
4 developed evidence that PULLEY and Mateen each has used a mailing
5 address separate from his own residential address.  As part of
6 the property to be seized, I request that any mailbox rental
7 agreements, lists of addresses, and mail box keys relating to the
8 individuals involved be subject to search and seizure to
9 determine at what other locations they may be receiving
10 correspondence and information about assets and sources of
11 income.

12    71.  On the various forms provided by MATEEN-LEMUS and
13 JACOBS to DHA, neither listed large sums of currency available to
14 them or other adult members of the household.  Based on my
15 training and experience and discussions with other law
16 enforcement personnel, I believe that individuals engaged in
17 criminal activity often maintain amounts of currency in their
18 homes and vehicles for ready access.  In welfare program fraud
19 cases, such currency shows additional assets that may be
20 unreported by the individual to which the individual has access.

21    72.  In many investigations of criminal activity where
22 evidence or the criminal activity is or may be found in an
23 individual's home or residence, articles of personal property
24 that tend to establish the identity of persons having dominion
25 and control of the premises, vehicles, storage areas, or
26 containers being searched is highly probative.  Such articles
27 include rent receipts, addressed envelopes, photographs,
28 unexposed film, video tapes, diaries, personal correspondence

26

1 addressed to or from one of the involved individuals or agencies,
2 utility bills, passports, social security cards, identification
3 documents, birth certificates, photographs, driver's licenses,
4 addressed letters and envelopes, personal calendars, address
5 books, organizers, Rolodex indices, checks, pay stubs, telephone
6 bills, loan payment records, and keys to the premises.
7 Additionally, if individuals involved in criminal activity
8 maintain storage units, safety deposit boxes or other storage
9 locations that may contain documents and other articles of
10 personal property constituting evidence of the criminal activity,
11 rental or lease agreements, keys, combinations and codes for such
12 locations often are maintained in their residences and vehicles
13 for ease of access and record-keeping.

14       73.   Individuals involved in criminal activity often keep in
15 their vehicles evidence of the criminal activity such as bank
16 statements, address books, letters, and currency, for ease of
17 access or for other reasons. It is reasonable to expect that in
18 a welfare program fraud case in which eligibility for program
19 benefits depends in part on whether an individual owns or has the
20 use of a vehicle, such evidence might include records relating to
21 the vehicle that commonly are kept in the vehicle, such as a
22 vehicle's registration certificate and proof of insurance.
23 During this investigation, UCE #1 sold PULLEY the 1997 Ford
24 Aerostar Van, CA license plate number 5LQZ809, and surveillance
25 has observed PULLEY and MATEEN-LEMUS driving and riding in the
26 van.   Surveillance has observed Mateen driving the 1992 Chevy
27 van, CA license plate number 5FHJ353, and Mateen has made
28 statements to UCE #1 indicating that JACOBS also uses the van.

27

1  MATEEN-LEMUS has stated to UCE #2 that PULLEY and MATEEN-LEMUS
2  recently transferred their 1993 Nissan Sentra, CA license plate
3  5GOU627 to JACOBS, JACOBS is the registered owner, and
4  surveillance has observed the Sentra parked outside of JACOBS and
5  Mateen's residence at 3517 33rd Street, Sacramento, California.

6         74.  Through surveillance and UCE reporting as discussed in
7  more detail above, I know that Safiyyah MATEEN-LEMUS and Richard
8  PULLEY live in the same house and are husband and wife.
9  Documents in the house such as photographs of MATEEN-LEMUS and
10 PULLEY may be found, as well as other documents pertaining to the
11 false statements in documents submitted to Sacramento County DHA.

12         75.  Though surveillance, UCE reporting and record checks I
13 know that Talya JACOBS and Seifudeen Mateen are married and share
14 the same residence.  Surveillance and UCE reporting have also
15 revealed individuals other than family members living on their
16 property.  I believe that documents pertaining to Mateen Boxing
17 Club, banks records, JACOBS' employment, as well as others
18 documents pertinent to the false statements submitted to
19 Sacramento County DHA will be found.

20      **2.  Searching Computer Evidence**

21         76.  Information obtained during this investigation
22 indicates that Seifudeen Mateen is the owner, operator, and/or
23 administrator of three businesses:  Masjid Al Mu'Mineen, Mateen
24 Boxing Club and Al-Mu'mineen Transport.  UCE #2 has seen a
25 computer in Mateen/JACOBS' home when they lived at the 9090
26 Fruitridge and at 7100 McClure Court location.  It is reasonable
27 to expect that Mateen or JACOBS uses their home computer to
28 assist in operating the businesses, including using the computer

28

1  to create and maintain records, produce flyers and other
2  marketing materials, and send and receive emails.

3      77.  Further evidence that Mateen uses his computer is that
4  he provided an email address as a point of contact for Al-
5  Mu'Mineen Transport.

6      78.  Richard PULLEY discussed in recorded conversations with
7  UCE #1 that he has used his computer to assist his music
8  business, while MATEEN-LEMUS has been observed by UCE #2 to use
9  the computer to work on documents, and she stated in a form to
10  DHA that one of her interests was working on computers.  Based
11  on the UCEs conversations with them, both PULLEY and MATEEN-LEMUS
12  have email accounts.

13      79.  From the criminal activity as described in this
14  affidavit, it is reasonable to believe that JACOBS and MATEEN-
15  LEMUS used computers and digital technology in order to
16  facilitate their criminal activity and/or that evidence of or
17  relating to the criminal activity may be found stored on their
18  computers.

19      80.  Based on my training and experience and conversations
20  with other law enforcement personnel, individuals with cellular
21  telephones often use them to contact and communicate with
22  individuals and agencies relating to their employment, bank
23  accounts and other assets, and other governmental agencies and
24  private businesses, and such contacts and communications can
25  provide evidence of income, assets, and real property relevant to
26  the telephone user's and user's spouse's application and
27  eligibility for welfare program benefits.  Such communications
28  and contacts can be evidenced by information stored in a cellular

29

1 telephone or at the service provider. As part of the
2 applications for search warrants described herein, I specifically
3 request authorization to seize and search cellular telephones and
4 other like devices found in the searches, to include reviewing
5 stored memory on the telephones such as call histories and
6 telephone books.

## IV. CONCLUSION

8    81. As set forth above, your affiant submits that there is
9 probable cause to believe that Richard James PULLEY, Jr. violated
10 Title 18 U.S.C. Section 922(g)(1): Felon in Possession of a
11 Firearm, beginning at a date no later than November 9, 2004, and
12 continuing until June 17, 2005. Therefore, your affiant requests
13 that an arrest warrant and complaint be issued for PULLEY.

14    82. Based upon the foregoing facts set forth in this
15 affidavit, I believe that evidence, fruits, and instrumentalities
16 of violations of Title 18 U.S.C. Sections 922(g)(1), 922(o),
17 1341, 1343, 1347 more specifically described in Attachments A-1
18 and A-2 will be found in the residence of Safiyyah MATEEN-LEMUS
19 and Richard PULLEY, located at 7871 53rd Avenue, Sacramento,
20 California, and, with respect to violations of Title 18 U.S.C.
21 Sections 1341, 1343, and 1347, at the residence of Seifudeen
22 Mateen and Tayla JACOBS, located at 3517 33rd Street, Sacramento,
23 California, and associated vehicles, as more specifically
24 described in in Attachments B-1 and B-2, respectively.
25 Therefore, I respectfully request that this Court issue a search
26 warrant for the locations more fully described in Attachments A-1
27 and A-2, which are attached hereto and incorporated by reference
28 herein, authorizing the seizure of the items described in

30

1 Attachment B-1 and B-2, which are attached hereto and
2 incorporated by reference herein.

3 I declare, under the penalty of perjury, that the foregoing
4 is true and correct, to the best of my knowledge and belief.
5 Executed on August 23, 2005, at Sacramento, California.

6
7                                    RACHEL F. PIFER, Special Agent
8                                    Federal Bureau of Investigation
9
Approved as to form:
10
11
PHILLIP A. TALBERT
12 Assistant U.S. Attorney

13

14 Sworn and subscribed before me this 23rd day of August, 2005.

15
16 HON. DALE A. DROZD
United State Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28

31

ATTACHMENT A-1

PROPERTY TO BE SEARCHED:

7871 53rd Avenue, Sacramento, California 95828.

Description of residence: Duplex dwelling with beige colored wood siding and maroon trim with an attached garage. The maroon colored numbers "7871" are posted to the left of the front door and to the right of the garage door when facing the house. The sides and back yards are fenced with a gate being on the right side of the house. The duplex unit attached to the subject location is unit number 7861. The subject location, 7871, is the unit on the right when facing the duplex.

VEHICLE TO BE SEARCHED:

White Van, 1997 Ford Aerostar, California license plate number 5LQZ809. The registered owner is Richard PULLEY. Agents plan to take this vehicle off-site to be searched.

ATTACHMENT A-2

PROPERTY TO BE SEARCHED:

3517 33rd Street, Sacramento, California 95817.

Description of residence: Two story stucco house, beige in color. The garage is attached with house number "3517" on the left hand side, the numbers are black with a white background. The front entrance has four columns. The yard is fenced in by a black iron like fence. The house is located on the east side of 33rd between 10th and 9th Avenues. The house located next to the search location is numbered 3509, it has light blue trim with a swing set in front and has a chain linked fence. The house on the other side is numbered 3525; this house is beige with maroon trim and has a maroon wooden slate fence.

VEHICLES TO BE SEARCHED:

A. Grey Van, 1992, Chevy 20, California license plate number 5FHJ353. The registered owner is Seifudeen Mateen/William Hernandez, DBA Almumineen.


B. Black Sedan, 1993 Nissan Sentra, California license plate number 5GOU627. The registered owner is Richard PULLEY pending transfer to Talya JACOBS.

ATTACHMENT B-1

Description of property to be seized from the premises of 7871 53rd Avenue, Sacramento, California and vehicles associated with Safiyyah MATEEN-LEMUS and Richard James PULLEY, Jr., all as described in "Attachment A-1."

The "Subjects" means the following persons or identities, each of whom is referenced in the preceding Affidavit of Special Agent Rachel F. Pifer in Support of Application for Complaint, Arrest Warrant, and Search Warrants:

- Talya JACOBS

- Seifudeen Mateen, aka Steve Hernandez

- Safiyyah MATEEN-LEMUS, aka Safiyyah Mateen-Lemus

- Richard PULLEY, aka Khaliq Ali Abdul As Salaam

The "Entities" means the following entities, each of which is referenced in the Affidavit of Special Agent Rachel F. Pifer:

-Sacramento County Department of Human Assistance

-The "CALWORKS" program

-The "Food Stamp" program

-The "Medi-Cal" program

-Mateen Boxing Club

-Bogard Hustler, aka Bogard Hustla

-Al-Mu'Mineen Transport

-Washington Mutual

-Safe Credit Union

1

-Wells Fargo

-Golden 1 Credit Union

-Bank of America

-Verizon Wireless

-Masjid Al'Mumineen

-Masjid Al Islam

-JNC Mortuary & Diversified Services

-Sleep Train

PROPERTY TO BE SEIZED

A. Documents such as address books, "Rolodex" files, email directories, emails, correspondence, envelopes and mailing labels, which pertain to and/or reflect communications among any of the Entities and Subjects.

B. Documents that reflect income, assets, cash and cash deposits, bank and credit union accounts, real property, business and partnership ownership interests belonging to or being controlled by the Subjects.

C. Documents that reflect any legitimate source of income or employment of the Subjects such as pay stubs and business correspondence.

D. Mailbox rental agreements, lists of addresses, and mail box keys relating to the Subjects.

E. Appointment books, calendars, time planner books, desk plotters, correspondence, and "scratch pads" containing notes of

2

appointments, orders, and purchases involving any of the
Entities.

F.   Telephone bills, including bills showing local and toll
calls, reflecting communications among the Subjects and Entities.

G.   Banking and financial institution records, wire transfer
records, bank statements, canceled checks, deposit slips, check
registers, check stubs, applications for and receipts for
cashier's checks, money orders, traveler's checks, bank wires,
bank drafts, bonds, stock certificates, certificates of deposit,
bank transfers, safe deposit keys, safe deposit box receipts, and
documentation of financial transactions reflecting the movement
of currency and/or negotiable instruments in the names of, or on
behalf of, any of the Entities or Subjects.

H.   Records, documents, and deeds reflecting the purchase,
lease or ownership of real estate, motor vehicles, furniture,
appliances, securities, precious metals, jewelry, and other
assets of significant, like value that are in the name of any of
the Subjects.

I.   All documents reflecting communications between one of
the Subjects and one of the Entities, or an employee of one of
the Entities, showing the use of the U.S. Postal System and/or
courier services.

J.   Retained copies of federal and/or state tax returns and
related tax preparation files to include work papers, schedules,

3

receipts, and any other source documents showing the acquisition of assets, expenditures, and sources of income in the names of Subjects.

K.    Currency over $5,000.00.

L.    Articles of personal property tending to establish the identity of persons having dominion and control of the premises, vehicles, storage areas, or containers being searched, including but not limited to rent receipts, addressed envelopes, photographs, unexposed film, video tapes, diaries, personal correspondence addressed to or from one of the Subjects or Entities, utility bills, passports, social security cards, identification documents, birth certificates, photographs, driver's licenses, addressed letters and envelopes, personal calendars, address books, organizers, Rolodex indices, checks, pay stubs, telephone bills, loan payment records, and keys to the premises.

M.    Rental or lease agreements for storage units, safety deposit boxes, and other storage locations connected to the premises being searched or the Subjects, and keys, combinations, and/or access codes for them.

N.    Any digital storage media capable of storing information in a form readable by a computer, including but not limited to hard drives, zip drives, floppy disks, Compact Disks, which could contain items in paragraphs A though M.*

4

O.   All electronic devices or computer hardware and all software necessary to access data on the digital storage media items described in paragraphs A through M, including but not limited to items which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data such as computer components, computer peripherals, work processing equipment, modems, monitors, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.*

P.   All passwords or data security devices instructions and all written or printed material which provides instruction of examples concerning the operation of a computer system, computer software, and/or related devices, or programs stored in the form of electronic or magnetic media necessary to operate the such items in order to retrieve the material described in paragraph A though O, which are capable of being interpreted by a computer or related components, including but not limited to operating systems, application software, password, decryption keys, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.*

Q.   Wireless or cellular telephones and their stored records, including all stored electronic communications and data

5

stored within the memory of the telephone and any server maintained by the service provider to include voice communications, the electronic address book, call records of calls made and received and the associated caller identification, subscriber entered messages (to-do lists), stored E-mail, text messages, two way messages and photographs, or any other communication device which might contain stored data which can be retrieved to show evidence of communication with known subjects or Entities.*

R. Items showing the possession or ownership of firearms by Richard PULLEY and/or Safiyyah MATEEN-LEMUS, including but not limited to firearms as defined by Titles 18 and 26 U.S.C., ammunition, ammunition magazines, holsters, firearm spare parts, receipts for the purchase, acquisition, and/or the repair or manufacture of such firearms or ammunition, tools for manufacturing or modifying firearms, photographs of firearms, or photographs of persons in possession of firearms.

In the event that agents/officers encounter safes, locked cabinets, and/or other secured containers and/or devices capable of containing any of the items listed in A through R at the location(s) and vehicle(s) identified above, it is requested that the Court direct the investigators to access the safe(s), locked cabinet(s), or other secured containers and/or devices to search for evidence as described above.

6

*Items N through Q may be seized for later search in a controlled environment. The items may be retained for a period of 60 days from the date of the execution of the search warrant in order for the agents to conduct a search of the digital media in a controlled environment.

ATTACHMENT B-2

Description of property to be seized from the premises of
3517 33rd Street, Sacramento, California and vehicles associated
with Talya JACOBS and Seifudeen Mateen, all as described in
"Attachment A-2."

The "Subjects" means the following persons or identities,
each of whom is referenced in the Affidavit of Special Agent
Rachel F. Pifer in Support of Application for Complaint, Arrest
Warrant and Search Warrants:

- Talya JACOBS

- Seifudeen Mateen, aka Steve Hernandez

- Safiyyah MATEEN-LEMUS, aka Safiyyah Mateen-Lemus

- Richard PULLEY, aka Khaliq Ali Abdul As Salaam

The "Entities" means the following entities, each of which
is referenced in the Affidavit of Special Agent Rachel F. Pifer:

-Sacramento County Department of Human Assistance

-The "CALWORKS" program

-The "Food Stamp" program

-The "Medi-Cal" program

-Mateen Boxing Club

-Bogard Hustler, aka Bogard Hustla

-Al-Mu'Mineen Transport

-Washington Mutual

-Safe Credit Union

1

-Wells Fargo

-Golden 1 Credit Union

-Bank of America

-Verizon Wireless

-Masjid Al'Mumineen

-Masjid Al Islam

-JNC Mortuary & Diversified Services

-Sleep Train

PROPERTY TO BE SEIZED

A.  Documents such as address books, "Rolodex" files, email directories, emails, correspondence, envelopes and mailing labels, which pertain to and/or reflect communications among any of the Entities and Subjects.

B.  Documents that reflect income, assets, cash and cash deposits, bank and credit union accounts, real property, business and partnership ownership interests belonging to or being controlled by the Subjects.

C.  Documents that reflect any legitimate source of income or employment of the Subjects such as pay stubs and business correspondence.

D.  Mailbox rental agreements, lists of addresses, and mail box keys relating to the Subjects.

E.  Appointment books, calendars, time planner books, desk plotters, correspondence, and "scratch pads" containing notes of

2

appointments, orders, and purchases involving any of the Entities.

F. Telephone bills, including bills showing local and toll calls, reflecting communications among the Subjects and Entities.

G. Banking and financial institution records, wire transfer records, bank statements, canceled checks, deposit slips, check registers, check stubs, applications for and receipts for cashier's checks, money orders, traveler's checks, bank wires, bank drafts, bonds, stock certificates, certificates of deposit, bank transfers, safe deposit keys, safe deposit box receipts, and documentation of financial transactions reflecting the movement of currency and/or negotiable instruments in the names of, or on behalf of, any of the Entities or Subjects.

H. Records, documents, and deeds reflecting the purchase, lease or ownership of real estate, motor vehicles, furniture, appliances, securities, precious metals, jewelry, and other assets of significant, like value that are in the name of any of the Subjects.

I. All documents reflecting communications between one of the Subjects and one of the Entities, or an employee of one of the Entities, showing the use of the U.S. Postal System and/or courier services.

J. Retained copies of federal and/or state tax returns and related tax preparation files to include work papers, schedules,

3

receipts, and any other source documents showing the acquisition of assets, expenditures, and sources of income in the names of Subjects.

K. Currency over $5,000.00.

L. Articles of personal property tending to establish the identity of persons having dominion and control of the premises, vehicles, storage areas, or containers being searched, including but not limited to rent receipts, addressed envelopes, photographs, unexposed film, video tapes, diaries, personal correspondence addressed to or from one of the Subjects or Entities, utility bills, passports, social security cards, identification documents, birth certificates, photographs, driver's licenses, addressed letters and envelopes, personal calendars, address books, organizers, Rolodex indices, checks, pay stubs, telephone bills, loan payment records, and keys to the premises.

M. Rental or lease agreements for storage units, safety deposit boxes, and other storage locations connected to the premises being searched or the Subjects, and keys, combinations, and/or access codes for them.

N. Any digital storage media capable of storing information in a form readable by a computer, including but not limited to hard drives, zip drives, floppy disks, Compact Disks, which could contain items in paragraphs A though M.*

4

O.   All electronic devices or computer hardware and all software necessary to access data on the digital storage media items described in paragraphs A through M, including but not limited to items which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data such as computer components, computer peripherals, work processing equipment, modems, monitors, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.*

P.   All passwords or data security devices instructions and all written or printed material which provides instruction of examples concerning the operation of a computer system, computer software, and/or related devices, or programs stored in the form of electronic or magnetic media necessary to operate the such items in order to retrieve the material described in paragraph A though O, which are capable of being interpreted by a computer or related components, including but not limited to operating systems, application software, password, decryption keys, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.*

Q.   Wireless or cellular telephones and their stored records, including all stored electronic communications and data

5

stored within the memory of the telephone and any server
maintained by the service provider to include voice
communications, the electronic address book, call records of
calls made and received and the associated caller identification,
subscriber entered messages (to-do lists), stored E-mail, text
messages, two way messages and photographs, or any other
communication device which might contain stored data which can be
retrieved to show evidence of communication with known subjects
or Entities.*

In the event that agents/officers encounter safes, locked
cabinets, and/or other secured containers and/or devices capable
of containing any of the items listed in A through R at the
location(s) and vehicle(s) identified above, it is requested that
the Court direct the investigators to access the safe(s), locked
cabinet(s), or other secured containers and/or devices to search
for evidence as described above.

*Items N through Q may be seized for later search in a controlled
environment.  The items may be retained for a period of 60 days
from the date of the execution of the search warrant in order for
the agents to conduct a search of the digital media in a
controlled environment.

6